**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **ADRIANA WALSH**, *on behalf of herself and all others similarly situated,*<br><br>*Plaintiff,*<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF EDUCATION,**<br><br>*Defendant.* | Civil Action No. 1:26-cv-01358-JPO<br><br>**FIRST AMENDED COMPLAINT** |

## I. PRELIMINARY STATEMENT

1. Plaintiff Adriana Walsh brings this lawsuit in a representative capacity of behalf of federal student loan borrowers like herself because of Defendant's widespread violations of section 1681s-2(b) of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, and the Privacy Act of 1974, 5 U.S.C.A. §§ 552a *et seq.* ("Privacy Act").

2. Defendant is a federal agency that regularly, directly and/or indirectly, through its servicer-agents (or simply "agents") provides information about student loan borrowers' account balances and repayment history to consumer reporting agencies (singular, "CRA").

3. For example, on Plaintiff's credit reports, information about her federal student loans through the Department of Education appears as being furnished by "Dept of Ed/Nelnet" and "DEPARTMENT OF EDUCATION/NELN." This naming convention is meant to identify the furnisher of consumer credit information.

4. Nelnet is an entity with which Defendant contracts for the servicing of certain federal student loans such as Plaintiff's.

5. Defendant uses other agents as well in connection with its furnishing of credit information to CRAs about federal student loans. For example, information about another of Plaintiff's federal student loans is listed on her credit report as being furnished by "MOHELA/DEPT OF ED."

6. Pursuant to their contracts with Defendant and federal law, Nelnet and other agents must follow Defendant's instructions with respect to reporting federal student loan information and the investigation onto FCRA disputes about the same.

7. As a general matter, Defendant requires the furnishing of information about federal student loans to CRAs and controls the manner and content of said furnishing, and servicers-agents have no authority to remove or alter certain reported credit information absent explicit permission from Defendant.

8. According to the Consumer Reporting Resource Guide, the credit reporting industry's definitive guidelines for furnishers of credit information published by the Consumer Data Industry Association ("CDIA"), "[r]eporters of federal student loan information include lenders, servicers, secondary markets, collection agencies and the U.S. Department of Education ("ED")."[1]

9. As Defendant knows, or should know, after it transfers the servicing of student loan accounts from one servicer to another, no money remains owing to the old servicer, which should report a $0 balance to the CRAs for those accounts.

---

[1] CONSUMER DATA INDUSTRY ASSOCIATION, *Consumer Reporting Resource Guide*, at 12-2, 2022.

10. Instead, when it transfers the servicing of student loan accounts from one servicer-agent to another, which it does for a variety of reasons, Defendant directs the old servicer-agent to place a "suppression" on the account. A suppression is equivalent to directions by Defendant to the old servicer-agent not to act with respect to the transferred account and specifically not to reduce the balance to $0.

11. Defendant's directive regarding suppression results in reporting to the CRAs the full pre-servicing transfer account balance, when it should be reported as $0 under industry-standard credit reporting procedures in order to avoid the duplicate reporting of accounts.

12. For many years, industry-standard credit reporting procedures under the CDIA required the transferor furnisher to report the transferred account to the CRAs with account code "AT" for "account transferred" and to reduce the balance of those transferred accounts to $0 after the transfer.

13. However, in September 2021, the Defendant issued CR 6051, which instructed loan servicer-agents to utilize the "L1 Segment" instead of the "AT" code and $0 balance for its transferred student loans. This Defendant guidance regarding the "L1 Segment" was in place through at least May 2024.

14. The LI Segment process was supposed to have one of Defendant's student loans report to CRAs in a single account or "tradeline" reflecting the old service-agent's payment history and the new servicer-agent's current account status. Relatedly, the old service-agents were not required to use the "AT' code or take any action (including reducing the post-transfer balance to $0) on the theory that the L1

Segment procedure would work properly and merge the old and new account into a single account (or tradeline) with the old account's history and the new account's name and status.

15. But Defendant's L1 Segment process was a failure. Predicably the process failed at several levels. The new servicer-agents often reported new tradelines but failed to include the L1 Segment to the CRAs, which led to Defendant reporting duplicative tradelines for the same account. Other times, the new servicer-agents reported the L1 Segment, but the CRA did not properly apply the L1 Segment or applied it to the wrong accounts, again leading to Defendant reporting duplicative tradelines for the same account.

16. Defendant did not properly monitor or supervise the new servicer-agents for its student loans to assume that the L1 Segment was promptly and properly communicated to the CRAs.

17. Defendant had no control over the CRAs themselves and could not even know whether they would properly follow and implement the LI Segment procedure.

18. Nor did Defendant notify the old servicer-agents of L1 Segment failures at any level, and instead instructed them to suppress any changes, leaving the old account the same, including with the balance that was no longer owed to the old servicer-agent post-transfer.

19. Later, when borrowers like Plaintiff saw their transferred federal student loans on their credit reports with balances allegedly owing to Defendant via

two separate servicers, they often exercised their rights under the FCRA to dispute the erroneous balance information which Defendant causes to be double reported.

20. Even upon indirect notice of a dispute through one or more CRAs, pursuant to standardized FCRA dispute processing procedures, Defendant directly and/or indirectly through its agents routinely and as a matter of practice failed to correct the nonexistent balances of transferred federal student loans to $0 and continued to report the pre-transfer balances even post an FCRA section 1681s-2(b) "investigation."

21. Because of Defendant's suppression directive, servicers have no discretion to correct the balance to $0 or to use the "AT" credit reporting code.

22. As a result of Defendant's conduct, Plaintiff and members of the class or classes she seeks to represent falsely appear on their credit reports to owe double the amount of federal student loan debt and suffer injury and damages in the form of harm to credit reputation, lost credit opportunities, and waste of time and resources lodging futile disputes and trying to correct Defendant's false credit reporting.

23. Defendant has long been aware of the problem of reporting a non-zero balance after the servicing transfer of federal student loans. Indeed, this problem has garnered the attention of the Consumer Financial Protection Bureau "CFPB") and the media.

24. Moreover, the problem is widespread and not limited to a one-off glitch. According to reporting in the Washington Post in May 2024,[2] Defendant itself said it "has received about 500 credit reporting complaints since December [2024]" concerning the reporting of student loan balances not owed to the reporting servicer.

25. Disputes from consumers like Plaintiff began to pile up as early as 2022 and 2023. Defendant's servicer-agents who had transferred student loans at Defendant's direction were receiving thousands of FCRA section 1681s-2(b) indirect dispute via CRAs in 2023 complaining about balances still appearing on their credit reports for the old service-agents.

26. Defendant is supposed to be noticed of trends or issues affecting more than 25 borrowers, but the above trend was overlooked, ignored or badly mishandled.

27. Defendant knew or should have known that its L1 Segment procedure was not working for thousands of borrowers.

28. Nonetheless, Defendant took no steps to correct this widespread error in its credit reporting for years, and its agents had no discretion or ability to do so without action from Defendant.

29. After governmental scrutiny inclining from the CFPB and the US Senate, and after Plaintiff's disputes, in May 2024 Defendant finally instructed its servicer-agents to change the balances of its transferred student loans to $0, and essentially abandoned the L1 Segment procedure.

---

[2] Danielle Douglas-Gabriel, *How a paperwork glitch is hurting student loan borrowers' credit scores*, THE WASHINGTON POST, May 29, 2024, *available at* https://www.washingtonpost.com/education/2024/05/29/student-loan-balance-duplicates-credit-reports/.

30. Still, even after that May 2024 change in procedure, numerous consumers indirectly disputed through the CRAs their pre-transfer balances for transferred student loan, many of which had a balance duplicatively reported, and Defendant through its servicer-agents still failed to correct the inaccurate credit reporting as required by FCRA section 1681s-2(b).

31. Federal agencies that participate in the furnishing of information to CRAs may be sued under the FCRA. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 64, (2024) ("A consumer may sue 'any' federal agency for defying the [FCRA]'s terms.").

32. Likewise, Defendant's servicers acted pursuant to Defendant's apparent and actual authority sufficient to establish vicarious liability cognizable under the FCRA. *See, e.g., Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 965-66 (6th Cir. 1998) ("An apparent authority theory is in keeping with the [FCRA's underlying deterrent purpose"); *Johns v. Nelnet*, No. 22-4791, 2026 LX 152031, at *59-60 (E.D. Pa. Mar. 31, 2026) ("The Court finds that LVNV can be found vicariously liable under the FCRA for actions taken by Resurgent acting as its agent."); *Jing Xu v. Better Mortg. Corp.*, No. 5:23-cv-05510-PCP, 2025 LX 136321, at *10 (N.D. Cal. Jan. 3, 2025) (creditor may be vicariously liable under the FCRA for loan servicer's actions).

33. Defendant's common course of conduct and legal violations entitle Plaintiff and those she seeks to represent to statutory damages, actual damages, punitive damages, and attorneys' fees and costs under the FCRA, and to relief under the Privacy Act.

## II. JURISDICTION & VENUE

34. Jurisdiction of this Court arises under 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

35. Venue lies properly in this district pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## III. THE PARTIES

36. Plaintiff Adriana Walsh is a natural person and resident of New York, New York. At all relevant times, she was a "consumer" as defined by FCRA section 1681a(c).

37. Defendant United States Department of Education is a federal agency. Its headquarters are located at 400 Maryland Ave SW, Washington, D.C. At all relevant times, Defendant was a credit furnisher and "person" as defined by FCRA section 1681a(b).

38. Millions of consumers in the United States have federal student loans. Defendant systematically collects and maintains sensitive and personal information including "[their] name, Social Security number (SSN), date of birth, student loan account information, contact information, driver's license and financial information."

39. Defendant continues to request and maintain this information during the lifetime of the borrower's student loan, including "disclosing information to third parties that assist [the Department] in administering federal student aid programs." *Id.*

40. To operate the federal student aid system, Defendant must collect and maintain this information for all borrowers.

41. As a federal agency, Defendant is subject to the requirements of the Privacy Act, 5 U.S.C. § 552a, with respect to records that it maintains on individuals.

42. Defendant is the creditor of Plaintiff and those she seeks to represent in this matter with respect to certain federal student loans.

43. Defendant, directly and/or indirectly through various agents, furnishes and/or causes to be furnished information about federal student loan borrowers, including Plaintiff and those she seeks to represent, to one or more consumer reporting agencies.

44. Defendant owns and controls the information furnished about Plaintiff and those she seeks to represent. To the extent that Defendant's various agents are involved in the flow of information about federal student loan borrowers to and from CRAs, its agents have no discretion over how to report, update, correct, or cease the reporting of said information. Rather, with respect to loans transferred from one agent to another and other reporting, they must obtain Defendant's approval prior to initiating any update, correction, or cessation of the reporting of the information. Defendant, not the loan servicer-agents, makes these determinations and decides whether updates or corrections to the furnished information are warranted, and all of its servicer-agents' day-to-day reporting operations are strictly cabined by Defendant's requirements.

## IV. FACTUAL ALLEGATIONS

*Applicable Legal Framework*

45. "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007) (citing 15 U.S.C. § 1681).

46. FCRA-covered entities must follow procedures in reporting consumer credit information that both "meet[ ] the needs of commerce" and are "fair and equitable to the consumer." *Saunders v. Branch Banking and Tr. Co. of Virginia*, 526 F.3d 142, 147 (4th Cir. 2008) (quoting 15 U.S.C. § 1681(b)).

47. In addition to well-known CRAs like Equifax, Experian, Trans Union, and Innovis, the FCRA regulates the conduct of persons who furnish information about consumers to CRAs.

48. If a consumer disputes "the completeness or accuracy of any item of information contained in [his or her] file at a [CRA]," the FCRA requires the CRA to take several affirmative steps. *See* 15 U.S.C. § 1681i(a)(1)(A).

49. Relevant here, the CRA that receives the consumer's dispute must "provide notification of the dispute to [the furnisher] who provided any item of information in dispute" [to the CRA] and "shall include all relevant information regarding the dispute that the [CRA] has received from the consumer[.]" 15 U.S.C. § 1681i(a)(2).

50. After receiving notice of the consumer's dispute from the CRA, a furnisher such as Defendant must "conduct an investigation with respect to the

disputed information[,] . . . review all relevant information provided by [the CRA, and] report the results of the investigation to the [CRA].” 15 U.S.C. § 1681s-2(b)(1)(A)-(C).

51. The FCRA accordingly requires that a furnisher of credit information such as Defendant to “conduct a reasonable investigation of [its] records to determine whether the disputed information can be verified.” *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004); *Saunders*, 526 F.3d at 148 (the “FCRA requires furnishers to determine whether the information that they previously reported to a CRA is ‘incomplete or inaccurate.’”) (citation omitted).

52. If the disputed information “is found to be inaccurate or incomplete or cannot be verified after any reinvestigation,” the furnisher must promptly “modify that item of information,” “delete that item of information,” or “permanently block the reporting of that item of information.” 15 U.S.C. § 1681s-2(b)(1)(E)(i)-(iii).

53. Furthermore, “[i]f the completeness or accuracy of any information furnished by any person to any [CRA] is disputed to such person by a consumer, the person may not furnish the information to any [CRA] without notice that such information is disputed by the consumer.” 15 U.S.C. § 1681s-2b(a)(3).

54. Circuit courts have repeatedly held that, upon receipt of notice of a dispute through a CRA, a furnisher must correct inaccurate information and minimally mark disputed accounts as “disputed.” *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1162-63 (9th Cir. 2009) (citing *Saunders*, 526 F.3d at 150); *see also Seamans v. Temple Univ.*, 744 F.3d 853, 867 (3d Cir. 2014) (a furnisher

violates FCRA section 1681s-2(b) "when, having received notice of a consumer's potentially meritorious dispute, [it] subsequently fails to report that the claim is disputed.").

55. The complete and accurate furnishing of information about consumers is important because even small errors can disproportionately influence the cost of certain services, such as mortgages, automobile loans, and credit cards.

56. Relatedly, designating disputed information as "disputed" is similarly important because "when a furnisher responds to a dispute verification form and relates an ongoing dispute, [a CRA] does not include the derogatory information in assessing the credit score." *Saunders*, 526 F.3d at 150.

57. A furnisher need not provide the information directly to the CRAs, nor must it directly receive or review disputes where it operates through an agent with apparent or actual authority; the actions of its agent are its own actions. *See, e.g., Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 965-66 (6th Cir. 1998) ("An apparent authority theory is in keeping with the [FCRA's underlying deterrent purpose"); *Johns v. Nelnet*, No. 22-4791, 2026 LX 152031, at *59-60 (E.D. Pa. Mar. 31, 2026) ("The Court finds that LVNV can be found vicariously liable under the FCRA for actions taken by Resurgent acting as its agent."); *Jing Xu v. Better Mortg. Corp.*, No. 5:23-cv-05510-PCP, 2025 LX 136321, at *10 (N.D. Cal. Jan. 3, 2025) (creditor may be vicariously liable under the FCRA for loan servicer's actions).

*Defendant's FCRA-Regulated Conduct*

58. Defendant is a federal agency tasked with, *inter alia*, overseeing various federal student loan programs, including that pursuant to which Plaintiff took out loans to finance her education.

59. Prior to 2010, Defendant acted primarily as a guarantor for federal loans issued by private lenders through the Federal Family Education Loan Program ("FFEL"), acquiring the loans directly only in cases of default.

60. Defendant had little to no involvement in the day-to-day handling of non-defaulted FFEL loans, or in the reporting of those loans to CRAs.

61. Accordingly, though FFEL loans are federal student loans that millions of borrowers continue to carry, credit reporting for FFEL loans not held by Defendant does not list Defendant or any other explicit notation that the loan is federal.

62. Similarly, tradelines for both FFEL loans and private student loans typically list only the servicer of the loan as the furnisher, even if owned by a different entity.

63. In 2010, Defendant discontinued the FFEL Program and switched entirely to Direct Loans, wholly owned by the Federal government and typically serviced by one of Defendant's servicer-agents.

64. In its standard promissory notes with borrowers for Direct Loans, Defendant defines itself to include its servicers.

65. Defendant enters into contracts ("Servicing Contracts") with each servicer, including Nelnet, which govern the conduct of those servicers.[3]

66. The Servicing Contracts prescribe exactly how servicers must manage payments, data, correspondence, and other issues, reserving substantive decision-making authority with respect to student loans for Defendant.

67. The Servicing Contracts also require servicers to follow practices that comport with federal law and regulations.

68. In the normal course of business, Defendant maintains detailed business records concerning, *inter alia*, student loan borrowers' account balances and repayment histories ("Student Loan Information").

69. The Servicing Contracts specify that Defendant retains full ownership and control over all Student Loan Information:

> It is understood and mutually agreed that the Department of Education has exclusive ownership of all information stored in, retrieved, modified, and/or archived in as part of this service. The contractor shall have no rights in such information and no rights to such information shall vest on the contractor by virtue of its performance of this contract. No other party has the right to copy, delete, archive, or transfer such information without the prior express written consent of the Department of Education. The contractor shall not use such information for any marketing or solicitation purpose including, but not limited to, commercial advertising, credit offers, or similar campaigns.

https://studentaid.gov/sites/default/files/nelnet-061709.pdf, at C.1.4.6.

---

[3] *Who Is My Loan Servicer?*, Federal Student Aid, https://studentaid.gov/manage-loans/repayment/servicers#your-servicer (last visited July 1, 2026) (explaining that Defendant assigns a loan servicer to handle the billing and other services "on your federal student loan on our behalf").

70. In the normal course, Defendant routinely furnishes Student Loan Information to CRAs, including Experian, Equifax, and Trans Union, directly and/or indirectly through its servicers, making it a "furnisher of information" as contemplated by the FCRA.

71. In contrast to FFEL loans, Direct Loan tradelines generally appear on borrowers' credit reports under the name "Department of Education" (or an abbreviation thereof), followed or preceded by the servicer's name, denoting Defendant's control over the content of the tradeline.

72. Indeed, federal law requires that Defendant—not its servicer-agents—"enter into an agreement with each consumer reporting agency to exchange information concerning student borrowers," including, but not limited to: "the total amount of loans made to any borrower . . . and the remaining balance of the loans;" and "information concerning the repayment status of the loan for inclusion in the file of the borrower" 20 U.S.C. § 1080a(a)(2), (3).

73. These agreements "shall contain such provisions as may be necessary to ensure that . . . no information is disclosed by the Secretary or the guaranty agency, eligible lender, or subsequent holder unless its accuracy and completeness have been verified[.]" 20 U.S.C. § 1080a(c)(1).

74. Mindful of the importance of the vital protections afforded to student borrowers by the FCRA, Congress explicitly stated that, "nothing in this subsection shall be construed to affect any otherwise applicable provision of the Fair Credit Reporting Act[.]" 20 U.S.C. § 1080a(a)(3).

75. Defendant's co-inclusion of its name on tradelines alongside the names of servicers reflects its explicit statutory obligation to enter into furnisher agreements with CRAs.

76. Defendant published a System of Records Notice explaining its maintenance of Student Loan Information and use for credit reporting. Specifically, Defendant indicates that it maintains a Common Services for Borrowers ( "CSB" ) system of records that "covers records for all activities that the Department carries out with regard to making and servicing" federal student loans, listing both Defendant and its servicers as the "System Location" for the Student Loan Information.[4]

77. Defendant indicated in the Notice that "[t]he CSB system of records will facilitate the *Secretary of Education's* performance of statutory duties to make and service" federal student loans including "[c]onducting credit checks or responding to inquiries or disputes arising from information on the debt already furnished to a credit-reporting agency."[5]

78. To fulfil the Department's statutory credit reporting obligations, Defendant requires that its servicers, including Nelnet, communicate Student Loan Information to CRAs using the METRO 2 format, a system of segments, fields, codes, and information unique to the credit reporting industry.

---

[4] Privacy Act of 1974; System of Records, 79 Fed. Reg. 54685 (Sept. 1, 2014).
[5] *Id.* at 54686-87 (emphasis supplied).

79. Defendant, directly and/or indirectly through its agents, provide information, including the Student Loan Information, in the METRO 2 format so it can be received by the CRAs' systems, interpreted by those systems, and incorporated into the credit files of specific consumers for use in credit reporting.

80. Using different METRO 2 codes, Defendant, directly and/or indirectly through its agents, communicates several important pieces of information about consumers' federal student loan accounts, each of which is referred to as a "tradeline" in credit reporting jargon.

81. Certain codes identify the type of account at issue and enable the receiving CRAs to distinguish among, for example, mortgage, student loan, and credit card accounts.

82. Other METRO 2 codes indicate whether a student borrower is current in their repayment of a federal student loan account or in arrears.

83. CRAs understand Defendant's direct and/or indirect communications of Student Loan Information in the METRO 2 format to convey information relevant to the creditworthiness and credit reputations of the student borrowers about whom they furnish information.

84. Accordingly, CRAs incorporate the Student Loan Information they receive directly and/or indirectly from Defendant into student loan borrowers' credit files and use it to prepare and sell consumer reports about them.

85. Actors in the credit industry rely on these consumer reports to accurately set forth consumers' outstanding debt, history of repayment, and other financial characteristics.

86. In addition, federal regulations include specific requirements for how different Student Loan Information must be reported.

87. For example, with respect to Borrower Defense to Repayment, the implementing regulations for the Higher Education Act provide that upon discharge of a borrower's obligations, "The Secretary also updates reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan." 34 C.F.R. § 685.206(e)(12).

88. With respect to rehabilitated defaulted loans, the rules require that "the Secretary instructs any consumer reporting agency to which the default was reported to remove the default from the borrower's credit history." 34 C.F.R. § 685.211(f)(8).

89. For loans subject to Closed School Discharge and discharge based on unauthorized payment, the regulation mandates that "[t]he Secretary reports the discharge of the loan under this section to all consumer reporting agencies to which the Secretary previously reported the status of the loan, so as to delete all adverse credit history assigned to the loan." 34 C.F.R. §§ 685.214(b)(4), 215(b)(5).

90. Pursuant to federal requirements, Defendant does not report a Direct Loan as delinquent until it has reached 90 days past due.[6]

---

[6] *See* https://nelnet. studentaid.gov/content/faq/faqcreditreporting. *See also* https://cri.studentaid.gov/content/faq/faqcreditreporting.

91. In the event of a dispute, the Direct Loan Promissory Note between Defendant and borrowers provides, "If a consumer reporting agency contacts *us* regarding objections you have raised about the accuracy or completeness of any information *we have reported*, *we* are required to provide the agency with a prompt response. *We* respond to objections submitted to consumer reporting agencies using the methods established by those agencies."[7]

92. Defendant's servicers acted solely as agents carrying out Defendant's statutory, regulatory, and contractual obligations with borrowers with respect to credit reporting, subject to strict requirements that cabined their discretion on operational decision-making, and such servicers operated within the scope of their delegated authority to act on behalf of Defendant.

*Privacy Act: Applicable Legal Framework and Regulated Conduct*

93. Defendant is an agency as defined under the Privacy Act of 1974, as amended, 5 U.S.C. §§ 5551(1), 552(f)(1).

94. Defendant maintains records related to Plaintiff and class members within one or more systems of records ("SOR") protected under the Privacy Act pursuant to 5 U.S.C. 552a(a)(4)-(5).

95. Most of the information collected by Defendant about student loan borrowers is stored in a system of records called the National Student Loan Database ("NSLDS"). The NSLDS is a database which contains, among other things, the

[7] Direct Loan Promissory Note, U.S. Dep't of Educ. 12, https://studentaid.gov/sites/default/files/Sub_Unsub_MPN_508-en-us.pdf (last visited Feb. 3, 2026) (emphasis supplied).

complete cycle of federal student aid, including "disbursement, repayment, deferment, delinquency, and closure." [8]

96. Relevant here, the NSLDS contains records relating to:

> information on the aid recipient's loan(s) covering the period from the origination of the loan through final payment, consolidation, discharge, or other final disposition, including details such as loan amount, disbursements, balances, loan status, repayment plan payments and related information, collections, claims, deferments, forbearances, refunds, and discharges.[9]

*Plaintiff's Experience*

97. Plaintiff obtained federal student loans to finance her education. After her graduation from medical school, Nelnet was her student loan servicer.

98. During this period, Defendant directly and/or indirectly through its agents furnished information about Plaintiff's federal student loans each month to CRAs Experian, Equifax, and TransUnion as "DEPARTMENT OF EDUCATION/NELNET" and similar variations, depending upon the abbreviations adopted by the CRA to which Defendant directly and/or indirectly furnished the information.

99. Defendant, at its sole discretion, routinely transfers the servicing of federal student loans like Plaintiff's from one servicer to another.

100. Defendant transferred Plaintiff's loan servicing from Nelnet to the Missouri Higher Education Loan Authority ("MOHELA"). At that time, the

[8] About the National Student Loan Data System, FAQs, https://nsldstraining.ed.gov/help/faq (last accessed September 12, 2025).
[9] 89 Fed. Reg. 44652, 44656–57.

outstanding principal balance on Plaintiff's loans from Defendant was approximately $150,000.

101. Nelnet confirmed this in correspondence dated May 1, 2023, when it notified Plaintiff of the following:

> The U.S. Department of Education (ED) will soon transfer the customer service of your federal student loan account to MOHELA, another member of ED's federal loan servicer team. Your loans are not being sold. ED will continue to own your loans; however, a different servicer will manage your loans and assist you on ED's behalf.
>
> ED is transferring your loan account to MOHELA because you requested to participate in the Public Service Loan Forgiveness (PSLF) Program. MOHELA is ED's servicer that provides customer service for all federal student loan borrowers who are potentially eligible for PSLF and tracks their progress toward qualifying for PSLF. This change in servicer will not impact the existing terms, conditions, interest rate, or available repayment plans of your federal student loans.
>
> Your loan account will be transferred to MOHELA on or about May 11, 2023. If ED doesn't transfer your account as planned, we'll let you know.

102. After Defendant transferred the servicing of Plaintiff's student loan account from Nelnet to MOHELA, Plaintiff's Department of Education/Nelnet account was closed and MOHELA opened a new Department of Education account for Plaintiff with a new loan number.

103. Defendant's own records confirm the transfer from Nelnet to MOHELA. These records show that both during and after the transfer, Plaintiff's student loan balance remained unchanged at approximately $150,000, and was linked to the new MOHELA account number.

104. Accordingly, after May 2023 and through the present, Defendant, directly and/or indirectly through its agents, should have reported to the CRAs that

the balances of Plaintiff's transferred student loan accounts at Nelnet were $0. Reporting is usually provided and updated to the CRAs by finishers on a monthly basis pursuant to METRO2 industry standards.

105. Instead, Defendant, directly and/or indirectly through its agent(s), continued to report to one or more of the CRAs that the balance of Plaintiff's student loan accounts at Nelnet was in excess of $150,000, resulting in reporting a total balance amount between Nelnet and MOHELA together of more than $300,000.

106. Defendant, directly and/or indirectly through its agent(s), disseminated information that the balance of Plaintiff's student loans was in excess of $300,000. In approximately February 2024, Plaintiff saw on her credit report that Defendant was continuing to report outstanding balances on the Nelnet tradeline in excess of $150,000 for the student loans that had been transferred to MOHELA.

107. Simultaneously, Defendant, as "MOHELA/DEPT OF ED" (or similar) was directly and/or indirectly reporting that Plaintiff had an *additional* federal student loan account due to Defendant with a total balance of approximately $150,000.

108. What should have been a standard student loan account transfer—whereby the previous servicer ceases reporting a balance on the transferred loan—instead resulted in duplicative reporting of the $150,000 balance by Defendant, directly and/or indirectly through its agents, to the CRAs, Experian, Equifax, and TransUnion.

109. This was false, inaccurate and/or misleading. Plaintiff no longer had any open student loan accounts with Defendant serviced by Nelnet and did not owe any amount for a student loan payable through Nelnet. Indeed, in correspondence after the transfer to MOHELA, Nelnet stated to Plaintiff directly that the balance of Plaintiff's student loans was $0.

110. As Defendant had transferred Plaintiff's loan accounts to MOHELA, it therefore should only have reported to the CRAs that Plaintiff owed money pursuant to those accounts, not two separate sets of accounts with two separate servicers.

111. Upon information and belief, Defendant did not make any efforts to assure that the information it disseminated or caused to be disseminated about Plaintiff's loans or student loan balance was accurate or complete.

112. Plaintiff disputed Defendant's false, duplicative balance reporting via Experian, submitting her first dispute on February 12, 2024, and her final dispute on April 23, 2024.

113. Pursuant to the CRAs' independent statutory obligation to notify the furnisher of disputed information upon receipt of a consumer's dispute of that information under FCRA section 1681i(a)(2), Experian provided notice of Plaintiff's disputes to Defendant directly and/or indirectly through its agents.

114. Nevertheless, in its responses to Plaintiff's disputes through Experian, Defendant, directly and/or indirectly through its agents, repeatedly failed to correct or reduce the duplicative balance to $0 and to fulfill its other obligations under FCRA section 1681s-2(b). Instead, it continued to verify, directly and/or indirectly through

its agents, that Plaintiff owed roughly $150,000 on the "DEPT OF EDUCATION/NELN" accounts; at the same time Defendant reported or caused the reporting of that same amount on the "MOHELA/DEPT OF ED" accounts, totaling approximately $300,000 on Plaintiff's credit report.

115. Upon information and belief, Defendant actively controlled Nelnet's routine investigative activities, and Defendant's investigation failure arose because of an error in the directive it provided to Nelnet in connection with Plaintiff's dispute.

116. Upon information and belief, Defendant added a "suppression" or other direction to Plaintiff's student loan and/or directed its agent Nelnet to do so, that forbade or otherwise prevented the furnishing of accurate data about Plaintiff's student loan account balance and/or the fact that her account had been transferred to another servicer even after the FCRA section1681s-2(b) investigation.

117. Upon information and belief, Defendant failed to make any reasonable efforts to assure that the information contained in its student loan records was accurate, complete, timely, and relevant.

118. Defendant was aware that the information it disseminated was inaccurate, based on disputes from Plaintiff and hundreds of similar disputes from putative class members.

119. Defendant willfully ignored the known effect of its suppression or similar directive and took no steps to correct it in order to render accurate the information it disseminated.

120. At all relevant times, Defendant acted directly and/or indirectly through its duly authorized agents, and/or employees with respect to the above-alleged conduct, and those agents acted within the scope of their authority.

121. At all relevant times, Defendant willfully or negligently violated the requirements of FCRA section 1681s-2(b).

*Defendant's Conduct Causes Substantial Harm*

122. By failing to accurately report Plaintiff and putative class members' transferred student loan accounts as having $0 balances, Defendant directly and/or indirectly through its agents misrepresented Plaintiff's and putative class members' total amount of indebtedness to one or more CRAs.

123. Defendant's direct and/or indirect misrepresentations have harmful, real-world consequences. According to the website of Experian, one of the three largest CRAs, the "total amount you've borrowed affects your credit score;" "[a]mounts owed are responsible for about 30% of your FICO® Score,"[10] and a consumer's "total credit usage" is "highly influential" in the calculation of the consumer's VantageScore, a credit scoring model created by Experian, TransUnion, and Equifax.[11]

124. Having a good credit score is extremely important because it "could be the difference between qualifying or being denied for an important loan, such as a

---

[10] EXPERIAN INFORMATION SOLUTIONS, INC., *What Affects Your Credit Scores?*, July 23, 2023, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-affects-your-credit-scores/ (last viewed Feb. 2, 2026).

[11] EXPERIAN INFORMATION SOLUTIONS, INC., *What Is a VantageScore?*, June 25, 2024, *available at* https://www.experian.com/blogs/ask-experian/what-is-a-vantagescore-credit-score/ (last viewed Sep. 20, 2024).

home mortgage or car loan. And, it can directly impact how much you'll have to pay in interest or fees if you're approved."[12]

125. Defendant's inaccurate reporting misstates Plaintiff's and putative class members' total debt burdens, harming their ability to borrow and obtain new credit.

126. In general, the more debt a consumer owes, the less new debt that he or she can take on. So even with a good credit score, Plaintiff and class members are limited in their borrowing capacity because Defendant's conduct makes them appear overextended and more indebted than they are actually.

127. Defendant through its servicer-agents communicated false indebtedness for Plaintiff and the class to the CRAs by containing the reporting of a balance on student loans after they had been transferred to a new servicer-agent. For Plaintiff, Defendant caused this inaccurate reporting at least to the Experian CRA after her loan was transferred from Nelnet to MOHELA in May 2023 and her disputes throughout in 2024.

128. Defendant through its servicer-agents continued to communicate false indebtedness for Plaintiff and the class to the CRAs even after they disputed through a CRA by continuing to report a balance on student loans after they had been transferred to a new servicer-agent. For Plaintiff, Defendant caused this inaccurate "verification" and post-investigation reporting after it, through its agent Nelnet,

---

[12] EXPERIAN INFORMATION SOLUTIONS, INC., *What Is a Good Credit Score?*, *available at* https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-is-a-good-credit-score/ (last viewed Sep. 20, 2024).

failed to correct the balance to $0 on the pre-transferred tradelines following Plaintiff's FCRA disputes via Experian in the February to April 2024 timeframe.

129. Since Defendant routinely reports its student loans to the national CRAs, Defendant knew or should have known that its student loan reporting concerning Plaintiff and the class would also be communicated by the CRAs to creditors and potential creditors in general. Indeed, CRAs are in the very business of selling credit reports and the student loan balances and other information that Defendant causes to be reported to the CRAs make their way onto credit reports on a daily basis in the credit marketplace.

130. Plaintiff's Experian credit report for example was communicated by the Experian CRA to the following of Plaintiff's creditors and potential creditors: On January 26, 2024, to Citi Cards/Citibank; on February 8, 2024 to OneMain; on March 25, 2024 to Credit One Bank; on April 3, 2024 to SoFi; on April 8, 2024 to Discover Financial; April 15, 2024 to TD Babk. All of these credit report communications to third parties caused reputational harm to Plaintiff due to Defendant's inaccurate and harmful credit reporting.

131. In addition to or in the alternative to the foregoing harm, the inaccurate Student Loan Information Defendant caused to be furnished about Plaintiff and putative class members injured them by wasting the time and financial resources they invested in their disputes.

132. Because disputing inaccurate credit information requires many steps, each of which requires consumers to expend time and financial resources, it is not economically neutral.

133. First, consumers must obtain a copy of their credit report and carefully review it to locate the inaccurate information. Second, they must prepare a letter or other communication identifying the information and explaining why it is inaccurate. Third, consumers may need to print their letters and any supporting documents, such as identification documents or correspondence from a third party, which consumes paper and printing resources. Finally, consumers must properly address their letters, place them in an envelope, and pay for postage, often including additional fees for delivery confirmation and return receipts, or take other actions to communicate their disputes to credit furnishers via CRAs as required by the FCRA.

134. Plaintiff spent time writing a dispute letter with several exhibits and spent money to send it to one or more CRAs by certified mail, expending at least $17 in postage in the February-April 2024 timeframe.

135. When Defendant, as a matter of policy and/or regular practice, directly and/or indirectly through its agents fails to correct the inaccurate information that Plaintiff and class members have disputed, all the above-noted time and resources expended go to waste.

136. Federal courts "have routinely found that wasted time resulting from a defendant's FCRA violation is a sufficiently concrete and particularized injury to establish [Article III] standing." *Healy v. Milliman*, Inc., No. C20-1473 (JCC), 2022

WL 1061921, at *3 (W.D. Wash. Apr. 8, 2022); *see also Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 943 (11th Cir. 2021) ("Because there is no question that wasted time is a concrete harm, [Plaintiff] has standing to pursue his claims."); *Norman v. Trans Union, LLC*, 669 F. Supp. 3d 351, 372-73 (E.D. Pa. 2023) ("Because wasted time and expense are concrete harms, Plaintiffs sufficiently establish injury-in-fact on this theory[.]"); *Hines v. Equifax Info. Servs., LLC*, No. 19-CV-6701, 2022 WL 2841909, at *8 (E.D.N.Y. July 16, 2022) ("[Plaintiff's] wasted time and expense is a traditional monetary harm that is fairly traceable to [defendant's] policy . . . and is redressable by judicial relief."), *report and recommendation adopted as modified* 2024 WL 4132333 (E.D.N.Y. Sept. 10, 2024); *Henkel v. U.S. Dep't of Ed.*, No. 1:24-cv-01676-SLS, ECF 28 (D.D.C. July 22, 2025).

137. Plaintiff also suffered emotional humiliation and embarrassment as a result of Defendant's inaccurate credit reporting, failure to correct the same.

138. As a result of the above, Plaintiff seeks damages for herself and the class or classes in order to recover for harms they suffered caused by Defendant's conduct, including: wasted time and money in futile dispute efforts; harm to reputation in the nature of defamation; and emotional distress.

## V. <u>CLASS ALLEGATIONS</u>

139. In light of the above, Plaintiff asserts that this matter is suitable for class action treatment and will seek the certification of one or more classes of similarly situated consumers at an appropriate time and based upon developments in discovery.

140. Upon information and belief, Plaintiff alleges that the members of the class or classes she seeks to represent will share the following characteristics:

A. They will have one or more federal student loan accounts;

B. Defendant will have transferred one or more of their student loan accounts from one student loan servicer, the transferor, to another, the transferee;

141. Defendant, directly and/or through its agents (*e.g.,* the transferee student loan servicer), will have furnished information about their transferred federal student loans to one or more CRAs;

142. Defendant, directly and/or through its agents (*e.g.,* the transferor student loan servicer), will have received notice of a dispute of the information furnished about their transferred student loan accounts to one or more CRAs;

143. In its responses to those notices of dispute through the CRAs, Defendant, directly or through its agents (*e.g.,* the transferor student loan servicer), will have failed to report a $0 balance for their transferred student loan accounts and/or will have failed to update the balance of their transferred student loan accounts to $0.

144. Plaintiff reserves the right to tailor the above profile of the class or classes based upon developments in discovery or as otherwise appropriate and permitted and will propose a specific class definition in connection with her anticipated motion for class certification as permitted by FED. R. CIV. P. 23.

## VI. CLAIMS FOR RELIEF

### COUNT ONE
### On Behalf of Plaintiff and Members of the Class or Classes for Defendant's Violation of 15 U.S.C. § 1681s-2(b)

145. Plaintiff incorporates the foregoing paragraphs as though set forth at length herein.

146. After receiving notice from one or more CRAs of disputes of inaccurate information that Defendant, directly and/or indirectly through its agents, had previously furnished to the CRA about them, by Plaintiff and members of the class or classes she seeks to represent, Defendant, directly and/or indirectly through its agents, negligently or willfully failed to report a $0 balance, correct the inaccurate information, and fulfill all of its duties under FCRA section 1681s-2(b).

147. Defendant is liable to Plaintiff and members of the Classes for all relief available pursuant to FCRA sections 1681n and 1681o.

### COUNT TWO
### On Behalf of Plaintiff and Members of the Class or Classes for Defendant's Violations of 5 U.S.C. § 552a

148. Plaintiff incorporates the foregoing paragraphs as though set forth at length therein.

149. Defendant maintains records that pertain to Plaintiff and class members.

150. Defendant violated 5 U.S.C. § 552a(e)(6) by intentionally and willfully failing to undertake reasonable efforts to assure that prior to disseminating records

belonging to Plaintiff and class members, such records were accurate, complete, timely, and relevant for agency purposes.

151. Consequently, determinations were made which were adverse to Plaintiff and class members, namely the dissemination of inaccurate student loan information and balances post-transfer, in violation of § 552a(e)(6).

152. As a direct and proximate result of this violation, intentional and willful disclosures of releases of erroneous information were released to third parties and Plaintiff has suffered and "adverse effect" as defined under 5 U.S.C. § 552a(g)(1)(D), including but not limited to indirect and direct injury to Plaintiff's reputation and emotional distress.

## VII. JURY TRIAL DEMAND

153. Plaintiff demands trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Honorable Court grant her the following relief:

154. certifying a class or classes under FED. R. CIV. P. 23 and appointing Plaintiff and her counsel to represent them;

155. awarding actual damages pursuant to 15 U.S.C. § 1681n(a) & o(a) and the Privacy Act;

156. awarding statutory damages in the amount of not less than $100 and not more than $1,000 per violation pursuant to 15 U.S.C. § 1681n(a);

157. awarding statutory damages in the amount of not less then $1,000 pursuant to 5 U.S.C. § 552a(g)(4)(A)

158. awarding punitive damages pursuant to 15 U.S.C. § 1681n(a)(2);

159. awarding costs and reasonable attorney's fees pursuant to 15 U.S.C. §§ 1681n and 1681o 5 U.S.C. § 552(a)(g)(2)-(4); and

160. awarding such other and further relief as may be necessary, just, and proper.

Dated: August 13, 2026

Respectfully submitted,

ADRIANA WALSH, *individually, and on behalf of all others similarly situated,*

By: */s/Courtney L. Weiner*
Courtney L. Weiner (#cw0305)
LAW OFFICE OF COURTNEY WEINER PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
T: (202) 827-9980
cw@courtneyweinerlaw.com

John Soumilas (*pro hac vice*)
FRANCIS MAILMAN SOUMILAS, P.C.
1600 Market Street, Suite 2510
Philadelphia, PA 19103
T: (215) 735-8600
F: (215) 940-8000
jsoumilas@consumerlawfirm.com

*Attorneys for Plaintiff and Putative Class Members*

**CERTIFICATE OF SERVICE**

I certify that on this 13th day of August, 2026, I caused the foregoing to be served via CM/ECF on all counsel of record.

*/s/ Courtney L. Weiner*